Filed 4/8/26  In re J.H. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re J.H., A Person Coming Under Juvenile Court Law. | B345387 |
| _____ LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. R.H., Defendant and Appellant. | (Los Angeles County Super. Ct. No. 25CCJP00415A) |

APPEAL from orders of the Superior Court of Los Angeles County, Cristina Gutierrez Legaspi, Judge.  Affirmed.

Nicole Kronberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Bryan Mercke, Deputy County Counsel, for Plaintiff and Respondent.

_____

Appellant R.H. (father) appeals the juvenile court's finding of jurisdiction and the dispositional order removing his son J.H. from his care. Father argues that, although there was an incident of domestic violence inflicted on D.L. (mother) in father's home, the evidence was insufficient to support the juvenile court's orders. We affirm the jurisdictional finding and dispositional order based on an argument two months prior to the documented domestic violence, the severity of the aggressive behavior (strangling mother to the point that she has difficulty breathing), the proximity of J.H. to father's aggression, and the parents' efforts to deny and/or minimize the violence.

**FACTUAL AND PROCEDURAL BACKGROUND**

**I.** *Initial Investigation and Detention*

**A.** *The Reported Incident*

In December 2024 the Los Angeles Department of Children and Family Services (DCFS) received a report of domestic violence between J.H.'s parents. At that time, J.H. was approximately two years old.

The incident occurred after the parents had been drinking and an argument ensued about father's infidelity. DCFS was informed that J.H. was asleep in the room where the argument occurred. Father "strangled" mother and she called 911. When the police arrived, J.H. was screaming and mother had strangulation marks on her neck. An odor of alcohol emanated from both parents. Father was arrested even though mother did not want him to be prosecuted. Mother refused an emergency protective order (EPO).

1. *Interviews with Mother and her Family*

On December 18, 2024, DCFS social worker Sergio Castellanos visited mother (she did not live with father).

2

Castellanos observed marks around mother's neck that were consistent with a physical altercation. When he asked mother how she received the injuries mother claimed her memory was not good, but she was able to recall that she and father were pushing each other around the bedroom.

Mother explained that during a struggle to reclaim her phone from father, he scratched her near her eyebrow and face. Father did not strike her in the face; rather, when she was looking through shoe boxes one day, the boxes fell and caused her to strike her face. Mother claimed J.H. was in another room asleep during the argument. Mother called the police and, due to her injuries, father was arrested. She refused an EPO because of her desire to work things out with father and co-parent J.H. Although father had three to four shots of tequila, she did not have any alcohol prior to the argument.[1] The social worker then spoke privately with the following other family members at mother's home.

<u>Maternal grandmother</u>. Mother and J.H. reside at maternal grandmother's "family home" in Apple Valley but they periodically spend a week at father's residence because of mother's employment. Maternal grandmother had not clearly seen mother's face. She reported that, on the previous day, mother complained of pain in her knee and sought medical

---

[1] Mother reported that sometime around October 2024, she had an argument with father that resulted in her calling the police but she ultimately terminated the call before reporting the incident.

3

treatment at Kaiser Permanente Hospital.[2]  Maternal grandmother characterized the parents' arguments as "normal."

Maternal aunt (T.L.)  T.L. explained mother's knee pain the previous day was because she played sports when she was younger.  On the same day as the interview, T.L. observed scratches on mother but did not ask her about them.  T.L. reported that J.H.'s parents do not have issues with alcohol and take good care of J.H.

Maternal aunt (I.L.)  I.L. was not aware of what occurred between J.H.'s parents and did not notice any scratches on mother when she returned home with J.H. the previous evening.

K.M.[3]  K.M. did not observe scratches on mother's face and was unaware of any issues between J.H.'s parents.  He had no concerns about the parents' ability to care for J.H.

2. *Interview with Father*

On January 2, 2025, Castellanos interviewed father at his home.  Father was separated from mother and was "involved" with other people.  On the date of the incident, father discovered photos of mother on mother's phone and questioned mother about sending them to another man.  He and mother wrestled over the phone, and both fell.  Father denied placing his hands around

---

[2]    Castellanos followed up with mother about the hospital visit.  Mother said her knee becomes stiff when the weather is cold.

[3]    Respondent DCFS identifies K.M. as a maternal uncle in its brief.  The citation to the record provided by DCFS does not provide clarity on this point and we did not find anything definitive in the record that refers to him as a maternal uncle.  However, father does not dispute DCFS's characterization of K.M.

4

mother's neck. J.H. was asleep in another bedroom when the argument took place. Father admitted he drank three shots of tequila before the argument. Approximately one month before the incident, father and mother argued but he claimed no punches were exchanged and law enforcement was not involved. Father professed his love for mother.

3. *Responding Officer and Related Police Report*

On January 13, 2025, Castellanos spoke with Bell Police Officer Derrick County—one of the officers who responded to mother's 911 call. County observed scratches on mother and the side of her face was swollen. The officer reported both parents "slammed each other on the floor of the home" while J.H. was asleep in the bedroom. Mother and father smelled of alcohol and marijuana.[4] The air conditioning was running despite the cold, 40-degree weather outside. J.H. was only wearing a diaper. Father was arrested because he was the aggressor.

A police report documented County's encounter with the parents and added additional details to the interview with County. It indicated the officer was dispatched to father's home at approximately 11:32 p.m. on December 16, 2024. Father lived in a "one bedroom room" at the rear of a residence. When County knocked on the door, mother opened it and stepped outside. County could hear a child crying in the background. Mother was sweating profusely, her neck was red, her hair was disheveled,

---

4    On January 23, 2025 (after Castellanos spoke with the officer), he contacted mother and told her that a responding officer said she and father appeared to be under the influence of marijuana and alcohol. Mother admitted they were drinking beer and smoking marijuana on the date of the incident. Castellanos told mother that DCFS intended to request a removal order targeting father.

and she had scratches on her face.  Mother said she called 911 because she was fighting with father and wanted to scare him.  Father complied with the officer's order to exit the residence.  He was also sweating and had a scratch mark on his neck.  Father stated, after arguing with mother over infidelity issues, she attacked him and he defended himself.

The report documents mother's statement that the parents were arguing over infidelity.  Father was "triggered" whereupon he wrapped both of his hands around mother's neck for five to 10 seconds.  Mother struggled to breathe but did not lose consciousness.  Father ultimately released mother after she began striking him.  As they wrestled around the room, mother was able to grab her cellphone and call father's sister and then the police.  J.H. woke up toward the end of the altercation.

4. *Social Worker's February 4, 2025 Unannounced Visit*

On February 4, 2025, social worker Cynthia Lima made an unannounced visit to mother's home.  She was greeted by maternal grandfather.  Mother eventually came to the door in a knee brace and using crutches.  She had knee surgery that day because she slipped in December and injured her knee.  Mother indicated that, since the incident, father has seen J.H. only through FaceTime.  Mother and father discussed rekindling their relationship and possibly participating in joint counseling.  She described the incident of domestic violence as "just tussling" as they were trying to get each other's phones.  Mother characterized father as a good father, noting that the incident was the first time he had gone that far with his anger.

Lima spoke with maternal grandfather in private.  He indicated mother and J.H. lived in the home and he expressed an

6

intent to continue to support mother.  Maternal grandfather described father as a "good dude" and, when the domestic violence occurred, everyone in the house was shocked.  After the incident, father visited the home and apologized for his conduct to everyone present.  Maternal grandfather thought alcohol may have played a role in the altercation.  He reported that mother and father had reconciled and father visited the home on the previous weekend.[5]

   5. *Social Worker's February 10, 2025 Visit with Father*

On February 10, 2025, social worker Richard Ramirez visited father's home.  Father lived in a back house; father's sister, husband and their child lived in the front house.  Father expressed remorse over the domestic violence incident.  He stated he eventually wanted to marry mother and have additional children with her.  Ramirez explained a case plan that included a parenting program, domestic violence program, therapy, and counseling.  Father agreed to comply with any plan to ensure his family remains intact.

Ramirez also spoke with father's sister/paternal aunt, J.C., in the front house.  J.C. was surprised by the domestic violence because father and mother had no prior similar incidents.  She described father as a very good father and a loving boyfriend to mother.  J.C. was happy the parents would receive DCFS services.

---

[5]      Lima subsequently confronted mother with maternal grandfather's statement that father had visited the home.  Mother was surprised and responded that, if father visited, it was likely to see his son and she was not home.

Ramirez returned to father and provided him with a case plan. Father signed the plan and expressed an interest in having joint counseling with mother. Ramirez provided father with a court date of February 27, 2025.[6]

### 6. *Mother's Partial Change of Heart*

On February 10, 2025, Lima visited mother's home and provided her with notice of the upcoming hearing. Mother indicated she was willing to participate in services, but she was not sure about joint counseling because she and father ended their relationship. Mother said she and father still loved each other but they would like to co-parent such that they switch custody of J.H. every week. Mother understood the concerns of DCFS but, in her opinion, the December 2024 incident was not that serious relative to other cases of domestic violence.

### B. *The Petition*

On February 13, 2025, DCFS filed a juvenile dependency petition pursuant to Welfare and Institutions Code section 300.[7] Based on the December 16, 2024 altercation and the odor of alcohol and marijuana emanating from the parents that evening, the petition alleged (1) there was a substantial risk that J.H. would suffer serious physical harm inflicted by a parent (§ 300, subd. (a); count a-1), and (2) as the result of the failure of a parent to protect J.H., there is a substantial risk that he will suffer serious physical harm or illness (§ 300, subd. (b); count b-1).

---

[6] There appears to be an error in the social worker's report as the hearing date was actually February 28, 2025. No issue of notice is raised on appeal.

[7] Unless otherwise specified, further statutory references are to the Welfare and Institutions Code.

**C.** *The February 28, 2025 Detention Hearing*

Following arguments of counsel, the court found there was "a substantial danger to the physical and emotional health of [J.H.]." It ordered J.H. detained from father with father given permission to have monitored visitation. Among other things, DCFS was ordered to provide family maintenance services to J.H. and his parents. J.H. was released to mother, under the supervision of DCFS, on the condition that she enroll in a domestic violence course and cooperate with DCFS.

**II.** *Secondary Investigation and Adjudication*

**A.** *Jurisdiction/Disposition Report*

1. *Mother*

Dependency investigator Nora Hernandez interviewed mother on March 7, 2025. The topic of the domestic violence in December 2024 resurfaced. Mother said she and father were drinking alcohol and smoking marijuana prior to the altercation. J.H. was asleep. Mother and father were not in a romantic relationship on the night of the altercation but it was understood that they would not date other people. Mother and father saw photos on each other's phones that bothered them. During the struggle she dropped her phone and it automatically dialed 911.[8] In her opinion, father was a good person and an excellent father. Mother expressed frustration that father was being kept away from his son.

2. *Father*

Some time ago, father left California for Arizona with his family. He returned in 2024 because he missed his son. When

---

[8] Later in the interview, she said she called the police to "scare" father.

Hernandez referred father to a clinic that offers various types of therapy and counseling, father mentioned that he had taken classes in Arizona. Father refused to elaborate on those classes.[9]

Father admitted that, while under the influence of alcohol and marijuana, he became aggressive with mother because he did not like what he saw on her cell phone. He said he placed his hands on her neck but he did not choke her. J.H. was asleep and did not witness the altercation. Father was unemployed for approximately one year and he planned to look for a job in the near future.

Hernandez reinterviewed father on March 13, 2025, in an effort to gather more information about father's drug use. Father did not believe it was necessary to discuss the matter because he had not used drugs for five years.

### 3. *Paternal Aunt (J.C.)*

J.C. was aware of father's substance abuse and assisted in his move from Arizona to California to help him with his sobriety. To her knowledge, father was no longer using drugs.

### 4. *Paternal Aunt (K.H.)*

K.H. also assisted in father's return to California. Father was struggling with pills in Arizona and needed support to remain sober. She was surprised to hear father had a physical altercation with mother as father is a loving person.

---

[9] The following day, father admitted to social worker Yasmin Saleh that he had a history with fentanyl and methamphetamine but stopped using the drugs before returning to California. Father said he did not share this information with Hernandez because he became nervous during the interview.

### 5. *DCFS's Conclusion/Recommendation*

The report found father strangled mother and that efforts by the parents to minimize the incident placed J.H. at a high risk of future physical and emotional harm. In addition, the parents' drug use and violence toward one another while under the influence of alcohol and marijuana threatened the safety of J.H.

DCFS recommended the petition be sustained, resulting in the removal of J.H. from the custody of father. It sought an order requiring father to participate in a domestic violence program, a parenting program, therapy, and random drug testing. DCFS also recommended mother participate in a domestic violence program for victims, a parenting program, therapy, random drug testing, and family preservation services.

### B. *Adjudication Hearing*

#### 1. *Arguments*

At the April 7, 2025 adjudication hearing, counsel for J.H., father, mother and DCFS appeared and offered arguments. J.H. argued for the court to sustain the b-1 count and dismiss the a-1 count. The b-1 count was supported by the parents' initial statements to the police and social workers as well as the prior incident of domestic violence. J.H. argued dismissal of the a-1 charge was justified because J.H. was not in the "zone of danger" corresponding to the domestic violence.

Father argued the entire petition should be dismissed because J.H. was asleep in another room when the altercation took place, it was a one-time incident, father was remorseful, and the October 2024 episode was not physical. Mother took a similar position, pointing out that a single incident of domestic violence was insufficient to support the allegations.

11

DCFS argued J.H. was in the zone of danger because he was in the home while mother and father were under the influence and fighting. It contended the seriousness of the conduct, the parents' minimization of the incident, father's past drug use, father's marijuana/ alcohol use on the night of the incident, and the prior incident of domestic violence justified the charges in the petition.

2. *Ruling*

The court sustained the petition. It found both counts true by a preponderance of the evidence and that J.H. was a person described by section 300. The court struck "the sentences [in the counts] that deal with mother and father being under the influence of marijuana and alcohol during the altercation, smelling of marijuana and alcohol, and the arrest of the father for . . . corporal injury." The court noted there was no evidence that being under the influence of alcohol or marijuana escalated the argument into physical violence. It stated, "Domestic violence is the crux of this case. And domestic violence is what is true."

The court was certain the December 2024 incident was not isolated. It referenced the October argument and found it was reasonable to infer that an argument alone is not enough for a parent to call the police. The court noted that patterns of hostility between parents generally do not jump from a simple argument to strangulation.

Turning to the level of violence and J.H.'s exposure to it, the court first pointed to the redness on mother's neck, the degree of force used by father (choking mother to the point where she had difficulty breathing), swelling of her face, and her sustained scratches. It was not persuaded by the arguments that J.H. was asleep in another room: "This court does not believe that the

12

child, a two-year-old child, simply not being in the same room takes him out of the zone of danger.  Mother and father were mutually fighting . . . with the father gaining the upper hand by choking out the mother.  . . . The mother could have been gravely harmed, and what would happen should this child have walked in."

After making its jurisdictional findings, the court moved to disposition.  The court declared J.H. a dependent of the court pursuant to section 300 and removed J.H. from father's physical custody.  It ordered J.H. released to the home of mother and that mother participate in family maintenance services, a domestic violence support group for victims, and individual counseling.  The court ordered father to participate in enhancement services, random drug and alcohol testing, a 52-week batterers intervention program, and individual counseling.  Father was permitted monitored visits with J.H.

## DISCUSSION

### I. *Standard of Review*

"'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them.  "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court."  [Citation.]  "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court.  [Citations.]  "'[T]he [appellate] court must review the whole

record in the light most favorable to the judgment below to determine whether it discloses substantial evidence … such that a reasonable trier of fact could find [that the order is appropriate].'" [Citation.]" [Citation.]' [Citation.]" (*In re I.J.* (2013) 56 Cal.4th 766, 773.) We ""'ordinarily *look[ ] only at the evidence supporting the successful party, and disregard[ ] the contrary showing*.'"'" (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1527, disapproved on another ground in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.)

'"When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.' [Citation.]" (*In re I.J.*, *supra*, 56 Cal.4th at pp. 773–774.) Before we assess the dispositional order, we will follow this blueprint and affirm the juvenile court's findings under section 300, subdivision (b)(1) without addressing the remaining allegation in the petition.[10]

---

[10] Father requests we reach the merits of the subdivision (a) allegation because it poses a risk of him being reported by DCFS for inclusion in California's Child Abuse Central Index (CACI) (Pen. Code, § 11170), which is accessible to certain potential employers and law enforcement. (See *In re D.P.* (2023) 14 Cal.5th 266, 279 (*D.P.*).) "Only reports of 'child abuse or severe neglect'——not 'general neglect'—must be forwarded to the CACI. [Citation.]" (*Id.*, at p. 281.) Father has not established that the factual basis for the subdivision (a) allegation warrants inclusion

**II.** *Sufficient Evidence Supports the Jurisdictional Finding*

### A. *Section 300 and Domestic Violence*

Section 300, subdivision (b) authorizes the juvenile court to exercise dependency jurisdiction over a child who "has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of" a parent's "failure or inability . . . to adequately supervise or protect the child." (§ 300, subd. (b)(1)(A).)

"The relevant inquiry under section 300, subdivision (b)(1), is whether circumstances at the time of the jurisdictional hearing "'subject the minor to the defined risk of harm.'" [Citation.] 'The court may consider past events in deciding whether a child currently needs the court's protection.' [Citations.] Indeed, in a domestic violence situation, past violence is highly probative of the risk that violence may recur." (*In re L.B.* (2023) 88 Cal.App.5th 402, 411, citing *In re John M.* (2013) 217 Cal.App.4th 410, 419, disapproved on another ground in *In re R.T.* (2017) 3

_____

on the CACI. He does not contend that DCFS has reported him for inclusion in the CACI, nor does he allege that he received the required notice that he has been reported (Pen. Code, § 11169, subd. (c)). Speculation that father will be reported for potential inclusion in the CACI is not a compelling reason to address the subdivision (a) allegation. (See *D.P.*, *supra*, 14 Cal.5th at pp. 281–282 [rejecting as "too speculative" father's claim that, although jurisdiction terminated, his appeal is not moot because he could be placed on the CACI].)

As an aside, we note the factual basis for both allegations was the same; thus, if the facts ultimately support including father on the CACI, our reversal of the subdivision (a) finding would not affect defendant's eligibility for inclusion on the list under subdivision (b).

Cal.5th 622, 628–629.)  "To establish a defined risk of harm at the time of the hearing, there "'must be some reason beyond mere speculation to believe the alleged conduct will recur.'"  [Citation.]"  (*Ibid.*)

Exposing a child to domestic violence can constitute a failure to protect a child from the risk of serious physical injury under this subdivision.  (*In re L.O.* (2021) 67 Cal.App.5th 227, 238 (*L.O.*); *In re R.C.* (2012) 210 Cal.App.4th 930, 941.)  "[E]ven a single incident of domestic violence may be sufficient to support a jurisdictional finding under [section] 300, subd[ivision] (b)."  (*In re L.B.*, *supra*, 88 Cal.App.5th at p. 411.)  "Jurisdiction is appropriate since a minor can be 'put in a position of physical danger from this violence, since, for example, [the minor] could wander into the room where it was occurring and be accidentally [injured] . . . .'  [Citation.]"  (*L.O.*, *supra*, 67 Cal.App.5th at p. 238.)

### B.  *An Assessment of the Evidence*

The nature of the domestic violence incident, and the circumstances both preceding it and following it, supported the trial court's jurisdictional finding.  This was not the first argument that mother believed was serious enough to call the police.  Approximately two months before the December incident, mother and father had an argument that was of such intensity that it caused mother to call the police.  Although mother terminated the call, it stands to reason that at some point during the argument her fear for her safety or the safety of her child was significant enough to involve the police.  We reject father's claim that the juvenile court simply speculated about the nature of the October event.  The court reasonably inferred the prior incident

16

rose to the level of a domestic threat such that it would be improper to characterize the December incident as "isolated."

The circumstances of the December incident also supported the court's jurisdictional finding as they were considerably dangerous. Father used both hands to choke mother with such force that she struggled to breathe and attempted to fight back. He released her only after she began striking him. Father left mother with "bruising/redness" on her neck and a scratched face. This sort of violent behavior undoubtedly posed a risk of harm to J.H.—a vulnerable two-year-old boy in close proximity to the assault.

We recognize the record suggests, for at least part of the argument, J.H. may have been sleeping in another room. But, at some point toward the end of the altercation he woke up as father was in the "bathroom area" with the crying baby when the police arrived. In any event, although J.H. may not have witnessed the entire episode of domestic violence, this does not negate the possibility that, in the future, J.H. might be present and by necessity be subjected to a risk of physical harm. (See *In re Heather A.* (1996) 52 Cal.App.4th 183, 194, fn. omitted ["Obviously the children were put in a position of physical danger from this violence [perpetrated by the father against the mother], since, for example, they could wander into the room where it was occurring and be accidentally hit by a thrown object, by a fist, arm, foot or leg, or by [the mother] falling against them"].) The trial court was rightfully concerned about what would have happened if J.H. entered the room during the assault.

"A parent's denial of domestic violence increases the risk of it recurring. [Citations.]" (*In re V.L.* (2020) 54 Cal.App.5th 147,

17

156.) In this respect, the way mother and father attempted to conceal and minimize the December violence is troubling.

Just two days after the incident, Castellanos asked mother how she received the marks on her neck; mother responded that her memory was foggy and that she and father were simply pushing each other. She characterized the December incident as merely "tussling" in such a way that the parents ended up on the ground. Although her initial memory of the incident was unclear, several months later she took the position that father put his hands around her neck but he did not choke her and she did not tell the police that she had been choked. Mother was unable to provide a consistent explanation of the December 911 call—she first made the claim that the phone automatically called the police when she dropped it (without explaining what sort of feature the phone had to accomplish this) then she said she intentionally called the police to "scare" father. At one point she attributed some of her injuries to tumbling shoe boxes. Despite the need to call the police in October and December, as well as father strangling her to the point that she had difficulty breathing, Mother described father as a good person and an excellent father.

Father engaged in similar tactics—on January 2, 2025, he told Castellanos he did not place his hands around mother's neck, and he and mother simply fell as they were wrestling. On March 7, 2025, he changed course slightly and admitted to Hernandez that he placed his hands on mother's neck but denied choking her. He acknowledged a prior argument but downplayed it by pointing out that law enforcement did not become involved and mentioned no punches were exchanged (as if punching is a customary consideration during spousal arguments). On

18

February 10, 2025, father suggested there was a probability of a long-term relationship with mother in that he intended to marry her and stated that "they" planned on having more children.

In sum, viewing the evidence through a lens favorable to DCFS, the record reflects: (1) an October argument that was serious enough to trigger a 911 call just two months before father choked mother in December; (2) a very dangerous December incident which, if mother was not able to escape, could have been fatal; (3) the close proximity of toddler J.H. to the December altercation such that he could wander in the room at any time and be exposed to potential harm; (4) the parents provided inconsistent statements regarding the December incident thereby suggesting efforts to conceal what actually happened; and (5) the parents made efforts to minimize the seriousness of the December event and, on many occasions, flat out denied that father choked mother. Under these circumstances, a reasonable trier of fact could have found jurisdiction under section 300 subdivision (b) because the evidence demonstrated J.H. was at a substantial risk of being harmed by the exposure to future domestic violence.

## III. *The Removal Order*

### A. *Section 361*

"""At the dispositional hearing, a dependent child may not be taken from the physical custody of the parent under section 361 unless the court finds there is clear and convincing evidence there is or would be a substantial danger to the child's physical health, safety, protection, or physical or emotional well-being if returned [to the parent], and that there are no reasonable means to protect the child's physical health without removing the child.'" [Citation.] In determining whether to remove a child, the court

19

'may consider the parent's past conduct and current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention.' [Citation.]" (*In re Miguel J.* (2025) 114 Cal.App.5th 635, 649.) "'The parent need not be dangerous and the minor need not have been harmed before removal is appropriate. The focus is on averting harm to the child.' [Citations.]" (*Ibid.*)

**B.** *Substantial Evidence Supports the Court's Order*

Many of the reasons supporting the jurisdictional finding also support the juvenile court's removal order. We again emphasize that the documented incident of domestic violence was aggravated (strangulation to the point where mother could not breathe). The parents minimized the December incident and the court rationally concluded that it was an escalation of what ended up in the termination of a 911 call just two months earlier. In addition, we are not presented with circumstances where, after the documented domestic violence, the parents immediately accepted responsibility for what happened, were open and honest with the social workers, and sought to live separate lives. Rather, based on mother's repeated efforts to defend father and minimize father's violent conduct as well as father's changing accounts of the December incident and desire to marry mother (and have additional children with her), it was reasonable to conclude that the relationship, and its accompanying dysfunctional component, was destined to continue. There was clear and convincing evidence that, absent removal, J.H. would be exposed to an environment that posed a substantial danger to his safety and/or emotional well-being.

**DISPOSITION**

The jurisdictional and dispositional orders are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

                                        KUMAR, J.*

We concur:


        HOFFSTADT, P. J.


        KIM (D.), J.

---

*        Retired Judge of the Superior Court of Los Angeles County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.